Sillelee v. Precision Automotive Corp, number 14-4193. This is a very interesting case and very well briefed. I'll tell you that right up front. I'm looking forward to arguing it. You may proceed. Me too, Your Honor. To conclude the court, my name is Jim Lursing. I represent the appellant, Jill Ticheli. I'd like to set aside four minutes for rebuttal, if that's granted. All right. I'd like to begin to focus this argument on what I think is the clearest, easiest path to reversal. The other side wants you to hold that the granting of a type certificate means that they cannot be held liable for any defects in the engine, even if the defects are manifest, even if they're apparent. May I ask a question at the onset? Do all of your claims relate to design defects, your negligence, your strict liability product claims? Does that all relate to design defects? That's correct. The claims that issue in this appeal, Your Honor. I'm sorry. Did you say they do? Yes, Your Honor. There is a claim that is under 14 CFR 21.3 that's not an issue in this appeal, and that deals with their failure to report a design defect, so that's a little bit different. But the claims that we're talking about on appeal today, Your Honor, yes, they do relate to defects in the engine design, specifically the carburetor. All of your claims, though, correct? Yes, Your Honor. That's right. We're not alleging here, for example, defective manufacturing. We're alleging defects in the design of the fuel metering system on the 0320 engine. Which has FCC type approval. I think we would agree, right? That's correct. The engine is type-certificated in 1966. That's right. And the production, FCC production certification, too, I assume. That's correct, Your Honor. So you're starting off with type certificate. Yes, I am. Which is great. Okay. And so, you know, the other side wants you to hold that because they have a type certificate for this engine, there can be no liability for any defect in its design. Well, aren't we pretty much bound by ABDULA? I'm sorry, Your Honor, I don't think that's what ABDULA found at all. ABDULA did not address the issue of type certification, did not address general aviation manufacture, and ABDULA ultimately found that the plaintiffs in that case had a remedy, that they could go forward, that they could prove violations of federal regulations. We think that result strongly supports our argument in this case. And, you know, the real reason that we know that the other side's argument simply cannot be correct is that we have to agree with ABDULA that there is field preemption in this area. So, Your Honor, we've taken issue with whether the preemptive field encompasses general aviation design. For purposes of the argument that I'm making now about type certification, we can even assume that it does, even if there is field preemption of general aviation design, we think type certification doesn't give them protection from liability if a violation of federal regulations is shown. And that's fully consistent with ABDULA. Isn't that really a question of semantics? Because if type certification is the standard, then the analysis is really that there's not a violation. So it's not that a violation goes unremitted. It's that if that is the standard, then if the standard is met, and there's not, because it would not preclude, as in this case, a failure to report, a failure to abide by the testing protocols, right, a failure to produce in compliance with the design type, that those things would not be precluded. But if you didn't have those types of claims, then there simply wouldn't be a violation if a type certificate is the standard of care, right? Well, that's correct, Your Honor. I think that it's important to recognize what a type certificate is and what it isn't. A type certificate, as we've explained in the briefs, is an initial pre-production, pre-manufacturing approval of the design based on, as the other side has explained, about 150 hours of engine tests, okay? And so they run the engine for 150 hours. And in this case, you know, they ran a prototype back in 1966 or sometime thereabout, and that prototype probably didn't exhibit this defect, right? But if you assume, and the federal judgment record is ample on this point, that the engine in this case failed, and the reason it failed is that the carburetor bowl in the throttle body came loose, and that caused fuel that was not properly atomized, not properly mixed with air, to flow up into the engine where it choked off the engine and resulted in a loss of power. It's pretty obvious, we think, and you could ask the FAA if you like, and I think they'll say the same thing, that if the prototype engine they had tested had done what the engine in this case did, it never would have been certified. And so the real question is, what does type certification mean? Is it a permanent get-out-of-liability? The actual question is, I think, what is the effect of a type certificate, right? On the one hand, I think your friends are saying it's conclusive proof, such that I guess in your language it immunizes them. You're arguing it's something less. What is it exactly? We don't think it's irrelevant. If they want to cite the fact that they have a type certificate as evidence that they comply with the regulations, then okay. And, you know, if they want to say we complied with what the FAA told us to do, then okay. We'll argue, on the other hand, though, that, for example, in this case, the regulation about fuel metering systems, this is 14 CFR 3335, was violated, because the system in this case, because it is prone to the type of leak I described, does not deliver an appropriate mixture of fuel to the engine cylinders. Now, I want to jump back to where I was. It was a good design. I'm sorry, Your Honor, I didn't catch that. You're saying it didn't deliver it because of the way it was designed. That's correct, Your Honor. Not because of some negligence or failure to include something or doing something in the making of the product. It's because of the, okay, it's the design. That's correct, Your Honor. And, you know, by the way, the FAA backs us up on this. You know, in 1972, the FAA sent a letter, and you'll find this in the district court docket number 234-8. They sent a letter to Lycoming, and they say, we have now sent to you 45 reports of loosened throttle body to bolt screws. What are you going to do about this? And in 1973, Lycoming issues a service bulletin, and the service bulletin says tighten the screws. And there's evidence in this case, expert testimony, that says that is an entirely inadequate solution. In fact, in many cases, it will make the problem worse if you just manually attempt to tighten the screws without doing anything else. Sir, can we go back to what is the effect of the type certificate? We've got the two. Sure. We've got the range, okay? You're saying, you're obviously saying it can't be conclusive. Well, what's the effect? It has some effect, right? Sure. It's a fact that I think. Is it provisional, or is it? It's a fact that I think the jury is entitled to consider. The import of a type certificate is they get to manufacture the product. In the same way, for example, the FDA drug approval lets them manufacture products. But when the products fit with medical device, for example, but when those products fail, there is still liability in those fields. And so, too, here. And so, you know, this is true because of the General Aviation Revitalization Act of 1994. Before we get there, a type certificate, when you look at what it is, a type certificate is issued when the airworthiness standards of the regulations have been satisfied and the FDA makes that determination. Airworthiness is defined as conforming to the type design, and in a condition for safe operation. You're asking that a jury be able to second-guess the decision made by the FAA that that standard is conformance and its safe operation has been met. Why would we enable the lack of uniformity, the additional requirements beyond what is set forth in the regulation by leaving that to state court claims rather than having a uniform standard in what the agency has decided in approving the type certificate? You know, we're not asking for the application of a different standard. For this part of the argument, I'm happy to assume that it's the federal regulations that set the standard. We do think there is absolutely nothing unusual about a jury deciding that those regulations have been violated, even when an agency reached a contrary conclusion 50 years ago. You know, for a recent example, you know, this court decided curbs. I suppose we had a jury in another state that found it was perfectly okay. I mean, how can you have a national air transport system when there's one standard in Oklahoma and another one in Pennsylvania? It would be chaotic. We need uniformity, don't we? And isn't that uniformity provided by Congress and the FAA? Your Honor, I don't think jury verdicts threaten uniformity in any way. This is commonplace. There are uniform regulations over locomotives. There are uniform regulations over drugs. But we constantly permit juries to get into these fields. It would be entirely foreign to American jurisprudence to close off all remedy for people injured in these accidents. No court before the district court in this case ever said you could do so, and Congress was well aware of it. And if I could just for one moment emphasize the import of the General Aviation Revitalization Act in the run-up to that statute, which was proposed by the industry. They wanted tort reform. They wanted relief from liability. All of the arguments that the other side is making, all of the concerns that have been voiced from the bench today were clearly called out. And it's in the legislative history. There are statements. You know, aircraft are regulated. Uniformity is important. The type certification process is very detailed. And Congress told you exactly what to do with those arguments. That's legislative history. That's not the text. The text could be read to still allow for preemption and even the use of the type certificate because it would leave out claims that there had not been compliance with the rules. There was not required reporting, for example. So it wouldn't render GARA entirely superfluous. Let me just focus on it for a second. Because, you know, the other side is this is their only answer to GARA, and so I really do want to emphasize our response. The subset of claims that would be left over is vanishingly small. They get rid of every design defect claim because every aircraft, engine, and propeller has a type certificate. If it's on an airplane, it's been approved in the type certificate. This is if your seat breaks. This is if the wing falls off. This is if the air stairs are defective. It doesn't matter. Every design defect claim forever gone. But you can still sue for negligence and also strict pro-products liability for failure to manufacture in accordance with that type certification, right? Actually, I'm not sure that you can, and here's why. As you noted earlier, there are three steps to certification. There's type certification, production certification, airworthiness certification. The last of these, the airworthiness certificate, is the FAA's confirmation that the aircraft that rolls off the production line conforms to its type design. So if a plane stands up and says this was negligently manufactured, it didn't conform to the type design, in the next case, if you rule for them, they are certainly going to say, no, no, no, the FAA has conclusively determined and there's an airworthiness certificate displayed on the windshield that says we do conform to the type design. We're not dealing with that in this case, are we? No, absolutely not. But that is the necessary import of the other side's position, and that is why I think... I could lead to that. I could lead to that. But right now, we're dealing with type certification, right? That's correct, but that is why I think GARA shouldn't be interpreted. Could you add five minutes to both sides? Go ahead. I think GARA, the import of GARA should be clearly understood in light of the import of their position. The industry would not have lobbied for tort reform if Congress had already preempted every design claim and the vast majority of manufacturing claims. The reason the industry needed this legislation, the reason Congress opted to pass this legislation, is that all of those claims were out there imposing liability on manufacturers regularly when they had bad designs or a bad manufacturer. Let's back up for a second. I want to clarify something you said earlier because I may be mistaken, but I thought you indicated that you acknowledge that the federal standard of care applies, i.e., that there is field preemption that reaches manufacturing design defect, but with federal standards. Is that your position, or are you arguing that field preemption doesn't reach as far as state tort law should? Sure. So we're arguing that even if federal preemption applies, type certification doesn't get them off the hook and you need to reverse in this case. If you think that the only way you can decide in our favor on the type certification question is to decide that federal standards don't apply, we've made an argument to that effect. But candidly, you know. We can't do that, can we? We've got Abdullah out there. So I'm happy to explain why I don't think Abdullah applies. In El Asad, this court interpreted Abdullah, and what it said was, well, actually, we can help you with that. I understand what you're saying, but. El Asad was a slippery floor case, now come on. But, first, this is separate from your type certification argument, right? Yes, Your Honor. I think our type certification argument holds the same amount of water, whether federal standards preempt state ones or not, and to be candid, as long as there is a remedy for my client. My client lost her husband because they built a bad airplane engine. You know, they designed a bad airplane engine. And the law has always recognized a remedy for people in our situation. If that remedy is not available, it would be a shocking change to the law, and that's why we think their type certification argument just simply can't be right. So tell us if that's the case, and let's assume for a moment that there is field preemption that reaches manufacturing and design. What is the federal standard of care? I mean, the problem with articulating that is what brought us all here, right? Sure. I think the federal standard of care is actually relatively straightforward. So the federal regulations set the standards by which manufacturers must initially comply for type certification and then comply on an ongoing basis, right? And that's our argument. Type certification doesn't constitute this forever indelible stamp of approval. It's an ongoing responsibility of the manufacturer to make sure they stay compliant. The permanent regulations have been cited in this case. The most important one deals with the fuel system. And as I said, it says the system has to be designed and manufactured to deliver an appropriate mixture of fuel to the cylinders under all atmospheric and flight conditions, basically. And so if the engine doesn't do that, we think it's negligence per se, and we think it's also grounds for strict liability. And it's not a difficult standard to articulate. It's written right there in the regulation. And we have cited examples of where exactly these standards were used. They'll appear in the jury appendix or on pages 585. And that was a case called Pease v. Lycoming, which used the federal standards. And then on 531 to 533, there was a case called Pridgen v. Parker-Hannifin in Pennsylvania court, which also used the federal standards to set forth jury instructions. And we did exactly the same thing here. Now what makes this case a little bit different from cases about the operation of aircraft has to do with the availability of a catch-all standard of care like Section 91.13, which says you cannot carelessly or recklessly operate an aircraft. That's something the district court judge picked up on, right? It seemed to motivate him to get a summary judgment filed, right? Summary judgment motion filed. Well, we think that that actually posed a problem for the district judge. The district judge looked at that and said, oh, I'm not sure there is a clear standard of care here. Maybe it shouldn't be preempted. But then he said, oh, I'm not going to disturb that. That's not the case, having decided that I think type certification provides an independent defense. It deals with pilots operating planes, doesn't it? You cannot operate in a reckless way. Is that really applicable here? No, Your Honor. We don't think that that particular regulation has anything to say about the manufacture of aircraft. We do think it suggests that background principles of negligence are relevant here. And so to the extent there's a gap to fill. And this, again, goes to whether there is preemption, not so much to what the standards of care are. To the extent you think there's a gap, you know, Justice Stevens' opinion and Wolin's provides further authority for this, you know, there is the ability to fill that gap, right? Help me with this, because if there is a gap and we've concluded that there is federal preemption, then we can't, on the one hand, we can't be filling the gap with the state law standards that we've now said is preempted, and on the other hand, we can't be conjuring up federal common law. I agree with you a lot, Your Honor. I think if you decide there's a gap, you have to decide no field preemption, right? So if you decide there is field preemption, then you're implicitly and probably explicitly deciding there is no gap to fill. So what I think is that to the extent you think there is no federal standard of care, to the extent you think the regulations don't set one out, you have to hold no field preemption. So then it's an all-or-nothing proposition that the type certificate answers the question that the federal standard has been met, or we're talking about state liability. I don't think that's correct at all, Your Honor. I think that even if you decide, okay, there's no gap for state law to fill, federal law completely preempts everything, I don't think that makes the type certificate any more conclusive. And, you know, one thing we haven't talked about yet is exactly what, you know, the federal type certification process looks like, and we discussed this in a lot of detail in our briefs, and so I won't belabor the points here, but, you know, type certification, to talk about it as if, you know, the Federal Aviation Administration has given its strong approval to this design overstates the matter substantially. Here's how it works in this case. You know, the O320 engine has many variants. It has approximately more than 90. I think it's either 92 or 96 variants of the O320 engine. The D2C variant, which is the one we're talking about here, was by no means the first. There have been many for decades before. And so, Lycoming, as a designee of the Federal Aviation Administration, is allowed to do its own tests and submit its own applications. And all those applications show is, you know, in the testing we ran, this engine conformed to the standards. And there are many possibilities. It's possible the defect didn't manifest during those tests. It's possible the data wasn't properly collected during those tests, or that it wasn't reported during those tests. Remember, we do have a claim live in this case that they've been concealing information from the Federal Aviation Administration, but even assuming they did everything by the book, they did everything right. But doesn't that seem too much, because those things still could be claims? I'm sorry? That is, that the testing wasn't properly done, that there was false reporting? Well, I'm not sure, Your Honor. It's not clear what their position would say about that, and I'll let them answer, and then I'll, you know, address it in rebuttal. You know, it's not 100% clear, because manufacturers have taken the position before that when, you know, a type certificate is granted, claims about, you know, errors in the certification process are barred because the FAA said grant it. And so, you know, it's not clear. And, you know, I don't know the answer to that question. But what I am trying to say, and what I think is clear from the record, is that type certification has never, ever been regarded by the FAA. Oh, and by the way, the FAA, again, is on our side on this. We're waiting on a brief from them, of course, in this case. But let's anticipate for a moment that they say the same thing in this case that they said in Cleveland, right? What they said in Cleveland for about, you know, 90% of their brief was federal standards preempt state ones. And then toward the last 10% of their brief, they answered the argument, well, what about the FAA's savings clause? Congress has always contemplated a remedy for people injured. And they said, oh, well, what the savings clause means is that a plaintiff has a full right, has a right to the full panoply of state remedies that can prove the violation of a federal design standard. And that's exactly what we're saying here. You know, there's a federal design standard for fuel systems. But that brings us back to the question. That's not what they said at the end of the brief in Cleveland. What they said at the end of that brief, and I'm turning to it now, basically was the statute, when read as a whole, instead shows Congress intended to preempt state law standards of care, but to preserve state law damage remedies for any injuries caused by a violation of a federal design standard. That's in the very last paragraph, bottom line. And that's the brief they filed in Cleveland. Yes, Your Honor. And I don't perceive any difference between that and the position I've just taken about type certification, because the designs at issue in Cleveland were in a type certificate. They just told me all your claims center around design, not violation of that design standard. Your Honor, I'm perhaps not understanding the question, but I think the gravamen of a design claim to the extent it's based on the federal regulations is the violation of federal design standards. The real question for us is whether the type certificate conclusively answers that question. And the short answer is Congress told you no in GARA, because it enacted a statute that would have been superfluous otherwise. You know, maybe not 100% superfluous, but 95% superfluous. You know, these 21.3 claims that we have live, those were not the claims that the industry was being hit with again and again that caused them to lobby for this or Congress to pass it. Years before, the industry had lobbied for a single federal cause of action for air, general aviation accidents, and Congress had rejected it, saying, no, this is state law territory. Let's go back to what is the general standard we could fall back on. And I'd like to get your thoughts and those of your colleagues present as to the definition of airworthiness itself in Section 305A, which talks about conforming to its type design and being in a condition for safe operation. Is that something that could function as a sort of catch-all general standard to the extent that there was not a specification as to the design in question? I'm not sure. You know, when you say in a condition for safe operation, you know, it's debatable whether that adds something to the idea that it meets its type design. But the type certificate part of the statute says you'll only get a type certificate if it's safe. And so, you know, I'm not sure that there really is data out there to create a new general standard. I think that, you know, it's probably the closest thing to Section 91.13, and therefore, when we're looking for an articulation of a general standard, that's as good a place as any. But I think that here we're talking about our specific standards. You know, I think there are clear specific standards, delivering appropriate mixture of fuel, for example, using materials that are suitable and durable, and their durability is established by tests. You know, using materials which experience has shown to be safe. You know, those standards, I think, can be put to a jury. They frequently are. And they can result in liability when they're not met. But they do result in inconsistent verdicts and standards that can therefore be imposed. For example, what does an appropriate mixture mean when you get down to percentages and ratios? Sure. Let me just try for a moment to, and I see my time is up, and so I don't want to be, you know, presumptuous. Let's just use this question then. Yeah, I don't want to be presumptuous and stand here for longer than you want me to. But, you know, let me just clean apart what you said a little bit. You know, you said they result in inconsistent verdicts and standards, right? And I think they can result in inconsistent verdicts, and they can, of course. I don't think that means they result in inconsistent standards. What happens in a jury verdict? You know, there isn't like a special verdict form that says, did this carburetor use locks and washers, you know? And then they say, yes. Is that, you know, a violation of the regulation? Yes. And then that's precedential and somehow creates a standard for that jurisdiction. You know, it's really much more of a rhetorical defendant's lawyer's trick to say that juries are creating new standards on the fly. They're not. They're finding that the existing standard was violated, and that's something that juries get to do all the time. You know, for example, in the railway context, this court held just this year that under the Locomotive Inspection Act, even though all locomotive parts need to be conformed to regulations, they need to be inspected and approved, you can have state law remedies for violations of a federal standard. And that's a case I had in their brief, Delaware v. Hudson Railway. This works the same way. There's no reason why a jury verdict creates a new standard. It's entirely – and by the way, they can also fix this problem very easily. I should just note this at the outset. There's a very easy fix to this problem, which is to use safety wire to put the bolts in place. Haven't we in the Supreme Court already addressed the question of whether state tort remedies create a standard in the sense that there's the same application of federal preemption, and that's because jury verdicts, as an economic matter, have the same impact on how an industry then needs to move forward. We don't treat federal preemption differently when we're looking at one versus the other, or is that what you're suggesting we should do in this case? No, there is a meaningful difference in some situations. But, you know, if you look at cases like, for example, Dyer v. Honda Motors, right, that's one of the cases that said common law can have a regulatory effect. But it did so to getting to the end of saying federal standards preempt state ones. There's never been a case, to my knowledge, that uses the reasoning Your Honor just described to say, notwithstanding a proven violation of federal regulations to a jury, no liability, right? And that's what they want in this case. They want us to be able to – even if we can show patently that there's a defect that we still lose because in 1966, the Federal Aviation Administration made a provisional certification. Really, they made it, and the Federal Aviation Administration rubber stamped it that this engine is okay. All right. Thank you. And now we'll hear from your adversary. Thank you, Judge Chigaris. Kenneth Chamigan of Williamson Connolly for Appalachia Avco Corporation. May it please the Court. Your Honor, as the Supreme Court has observed, the Federal Aviation Act, quote, requires a uniform and exclusive system of federal regulation. If the congressional objectives underlying it are to be fulfilled, end quote. Consistent with that observation, in Abdullah v. American Airlines, this court held that federal law preempts the entire field of aviation safety. Didn't that in part rely upon 14 CFR 91.13, don't operate in a reckless way, et cetera, and that's really not what we're dealing with here, is it? Judge Van Antwerpen, we ultimately don't think that the Court's reasoning in Abdullah turned on the relevant regulations, or at least on the existence of the catch-all regulation, and that is for the simple reason that in determining whether or not there is field preemption here, we're ultimately making a determination about congressional intent, about the intent of the Congress, at the time it enacted the Federal Aviation Act. Now, I think it's important to underscore that when Congress adopted the Federal Aviation Act, it really did two things. To be sure, it gave the FAA the authority to promulgate federal design safety standards, and the FAA has done so comprehensively and pervasively, including, of course, in the context of engine design and manufacture. But, of course, it also gave the FAA the authority to enforce those standards through the certification process. And the reason why we believe that our view on the issue of type certification, on the issue of whether type certification has preclusive effect, really flows from this Court's decision in Abdullah, is because if juries were, in fact, permitted to reach inconsistent conclusions about whether federal standards were satisfied, it would lead to all of the same concerns that justify field preemption in the first place. Well, then, would you agree? If we accept your argument, then what your adversary is saying about immunity is true, then, right? Well, it is true in a limited respect, Judge Shigera. So, just to be clear about what's going on in this case, we have claimed violations of federal standards, and we set out the various standards in the brief. There are really two types of claims at issue here. There are claims that the FAA essentially erred when it made its determination to issue a type certificate for the engine at issue here. And then there are claims that information came to light after the initial type certification in 1966. The latter category of claims are not preempted, and, further, the type certification obviously has no effect with regard to those claims. And while my friend, Mr. Singh, suggests that that's the tail on the dog, either in this case or more generally, I think it actually really is the gravamen of the claims here. And if you take a look at the description of the evidence in plaintiff's brief, plaintiff points, and Mr. Singh pointed today to the footnote that cites, for instance, the service difficulty reports, and he correctly concedes that in response to those service difficulty reports, which are reports that are filed with the FAA concerning problems with an aircraft or an engine, Lycoming took action. Lycoming, in fact, took action and issued a service bulletin as early as 1973, suggesting that the solution to this problem, the remedy to the problem, was to have regular maintenance on the screws. Now, it may very well be that plaintiff argues that that is, in fact, an insufficient remedy and that Lycoming should have done more, but to the extent that the claim here is really essentially a failure after the type certification to report defects, obviously the type certification itself can have no preclusive effect. And so this is really a meaningful category of claims, not only in this case but also in future cases, and really the only argument that we could conceivably have before this court at this stage is the argument that we do not have a duty to plaintiffs under Pennsylvania law, and there may be other factual defenses to that claim. But for purposes of this discussion, there's no preemptive effect with regard to a claim that evidence came to life later. The only preemptive effect is with regard to the type certification. If we go back to type certification, I mean, we're sort of, we don't have a lot guiding us here as to whether it's, as you say, conclusive or something less. What we do have, though, is, and, you know, speaking as a layperson, you have a system where at least your friend said, you know, you're able to basically give yourself a type certification. And under those circumstances, logically, should we make that conclusive? You know, I mean, I'm not talking about you because I don't mean anything against your client, but an airplane manufacturer, let's say a firm that designs and manufactures, they produce a plan, and they certify it, now they've immunized themselves for time in memoriam. So I don't think, with respect to my friend Mr. Singh, that his description is an accurate description of how type certification operates in practice. So to start, of course, with the statutory scheme, it is certainly true that there are provisions in the statutory scheme that give some degree of authority to delegates or to designees to participate meaningfully in the testing process. There's nothing surprising or objectionable about that because, after all, designees, including manufacturers, have expertise and familiarity that can assist the FAA in making its ultimate determinations. My understanding is that the FAA retains the ultimate authority to make determinations with regard to type certification, and, of course, the FAA did so here when it issued the type certificate it issued in 1966. But manufacturers can also issue them, right? The FAA doesn't have the monopoly on this. They've delegated that. I mean, they could come in and do it, but then they don't have the power to delegate that. My understanding is that with regard to type certificate decisions, the ultimate decision is made by the FAA to be sure based on data that are submitted by manufacturers. In every case, the FAA passes on the type certificate? My understanding is that that is ordinarily the case. I don't know off the top of my head whether there are exceptions to that, but the FAA's handbook indicates that that is how the FAA operates. With regard to type certification, of course, there are other types of certificates out there. My point for purposes of this discussion is simply that there's nothing strange about that. That is a feature of the system, much as is true in the context of, for instance, approval of medical devices by the FDA or, for that matter, approval of prescription drugs, It's the way Congress set it up. That is the way that Congress set it up. Let me understand what you're saying. You're saying as to type certification and design type certification, that's it. But are you conceding to me this morning that if following type certification, the manufacturer was put on notice that there were problems with certain screws coming loose, that that is not protected by type certification? Are you conceding that or are you just summarizing your opponent's argument? I am conceding that where there is a claim, as there is in this case, that there is a failure to report failures or defects under Section 21.3, that that claim would not be preempted. And there may be other types of claims that are not preempted as well. And so to give one example, if, for instance, a manufacturer failed to comply with an error-worthiness directive, that would be also a claim that could potentially proceed. Our view is simply that there is preemption where the FAA has made a contrary determination. And, again, if both claims are in this case, then you're saying they would not be protected by type certification. Are they on appeal before us? The only issue on appeal before this Court for purposes of preemption is the claim that the regulations that govern design that were the subject of the FAA's type certification determination. And just to be clear about what those regulations are, they are general regulations, such as the regulations in CAR 13-100, 101, and 104, such as the requirement that engines shall not incorporate design features that are hazardous or unreliable. That really is, I think, the closest thing to a catch-all regulation with regard to engine design. And also the specific regulation, 13-110, regarding fuel system design. And let's just assume in this case. So those other claims are still in the district court? The claim that would be left in the district court for purposes of preemption. And, again, we have arguments as to why that claim fails, including the argument before this Court. There's no duty under Pennsylvania law. But the claim that clearly survives is the 21.3 claim. And let's just assume that this were a case. Is that on appeal before us, the 21.3? The order before this Court allowed the 21.3 claim to proceed. And we think that's erroneous on the alternative state law ground. But for purposes of preemption, we are not challenging the district court's determination. And, indeed, we are conceding before this Court that where you have a claim regarding defects that came to life after type certification, that that claim could be allowed to proceed. How do we square that with the reading with the plain language of DARA? Because it already has a carve-out where the type certificate has been fraudulently procured. You're saying that those are claims that survive, but there wouldn't have been a need to specifically allow those to go forward if they already survived. Well, I don't think that the carve-out in DARA specifically pertains to the type certification. It really is a broader claim of misrepresentations or concealment or withholding of information of any kind from the FAA. And so, obviously, you could have a circumstance in which, for instance, if you have a failure to report a claim under Section 21.3, it might very well be that that exception is applicable in that circumstance. And this gets back to Mr. Singh's argument concerning GARA, and I want to address that directly. I think Mr. Singh's argument really is today that there is a negative implication from GARA as a result of the fact that GARA preempted state law in this one additional very specific respect, namely by preempting state statutes of repose. And in essence, I think that what Mr. Singh is arguing is really that GARA somehow altered the preemption landscape. I think there are two potential arguments he could be making. That's one of them, and the other could be that you could somehow impute back to the Congress that enacted the Federal Aviation Act the views of the Congress that enacted GARA. If his argument is that GARA altered the landscape, we simply don't think that the text of GARA is consistent with that view because, again, it is a subtle law that you could have an express preemption clause and yet have somewhat broader implied preemption. I don't know if we've incited GARA in Abdullah. No, because Abdullah was the commercial aviation case. But, of course, our view is that commercial aviation and general aviation should be treated the same way, and if you take a look at the relevant provisions of the Federal Aviation Act, they give the FAA essentially a parallel authority to establish minimum standards both with regard to commercial aviation and with regard to general aviation. My point is simply that whatever the wishes of manufacturers at the time that GARA was enacted and whatever views were expressed in the legislative history, all that Congress ultimately did was to preempt state law in an additional and, to be sure, somewhat unusual respect in preempting statutes of repose. Congress in no way altered the ordinary operation of field preemption, which, of course, itself was somewhat uncertain at the time that Congress adopted GARA because that was in 1994 around the time of the Tenth Circuit's decision in Cleveland  It doesn't get any clearer. Your reading wouldn't render GARA entirely speculative, but it would almost entirely because the back of claims would be knocked out, those state towards product defect claims. If you're looking at the purpose of the statute, that's what it seems to indicate. But when we go back to the legislative history of GARA, it's crystal clear, isn't it, that Congress, at least in 1994, had the understanding and expectation going forward that state law negligence and strict liability claims would apply. They specifically address the question of whether it would have made more sense for them to enact a federal standard of care and say that that would not be such a good idea because that would still need to be interpreted nationwide, leading to inconsistency. It was better to rely on the state law standards. And it references the two prior bills in 1990 and 1992 that didn't move forward. But doesn't all of that indicate that it was Congress's understanding, at least in 1994, that state law causes of action, not just remedies, had survived and would survive? And isn't it also true when we look at how the Supreme Court addressed a very similar question in Silkwood, looking back to the Price-Anderson legislation, subsequent statute, subsequent legislative history, and recognize that where Congress there indicated its assumption that state law remedies would persist, that that was something relevant in how it interpreted the original intent of the statute? So a couple of points in response to that, Judge Krauss. I mean, I think, first of all, it certainly is an established principle of statutory interpretation, and I think it would apply here as well, that the views of a later Congress are a hazardous basis for inferring the views of an earlier Congress. And I think that's particularly true when you're talking about the subject of the failure to enact other bills, which, again, is something that the Supreme Court has suggested really is entitled to no weight. Second, it certainly is true that there are statements in the legislative history about the survival of state law claims. I think our point is simply that those views really don't speak, at least with crystalline clarity, to the exact scope of surviving state law remedies. And, of course, we acknowledge that there are circumstances in which state law remedies will be available, and so that is precisely why our position is consistent not only with the express preemption clauses in GERA and earlier in the Airline Deregulation Act, but also with the savings clause. The savings clause in the Federal Aviation Act is, of course, framed with specific reference to any additional remedies, again, without speaking to the scope of exactly what those remedies are. Now, I can't stand before you and say exactly what percentage of claims that are theoretically available would be left under our interpretation. What I can say is that it is not at all uncommon, looking back on some of these state cases, to see claims that there is information that came to light after the point of type certification that would give rise to a claim. And, of course, again, that's the category of claims that we think, in fact, survive. But the clarity, you need to muster clarity on your side because we're working against a presumption that very traditional state police powers that go along with tort law remedies and manufacturing design defect are asking us to overcome that presumption. We do that when there's clear and manifest intent by Congress. There's not in the text. You're asking us to be the first court of appeals that would hold that there was field preemption that reached manufacturing design defects, right? I don't think that that's quite correct, but let me say, I think, three things in response to that question, Judge Krause. The first is that we don't really think that the presumption against preemption applies where you have a long history of federal regulation. We cite the Roth case for that. But second, this court acknowledged the presumption against preemption, both in the Abdallah case and in the Al-Assad case, but concluded that it had been overcome, and I think rightly so, given the strength of the federal interest here in uniformity. And I think it's no accident that while field preemption is a relatively rare thing, the context in which you often see it is in the context of planes, trains, and ships, the context of airplanes, the context of the Ports and Waterways Safety Act, which was, of course, the subject of Ray and later in Locke, and, of course, near and dear to this court's heart, the Locomotive Inspection Act, which was, of course, the subject of the Supreme Court's decision in Kearns. Those are all areas in which uniform standards are paramount. And I guess if I have one fundamental submission to the court today, it is that the imposition of state liability would work the same pernicious effects that the application of a different state standard of care would. It would lead to precisely the same inconsistency and resulting disuniformity in an area in which Congress has made clear its overriding desire for consistency. And while it is certainly true that when Congress adopted the Federal Aviation Act in 1958, it was not really focusing on the issue of juries imposing liability. It was clearly focused on the need for consistency because, as we explain in our brief, it was enacted against the backdrop of this potpourri of federal agencies that were regulating various aspects of aviation and aviation safety. And what Congress made clear in the Federal Aviation Act, and this is, of course, borne out in the various provisions that we cite, was the overriding need to have a single regulator, then the Federal Aviation Agency, which would promulgate uniform standards and enforce them. And, of course, the Federal Aviation Administration, as it now is, has very broad enforcement power. And, of course, in a circumstance in which- May I interrupt you at this point? Sure. Your argument was made by the appellant that if we give preclusive effect to tax certification, that such an effect will follow for protection certification and airworthiness certificates. Do you have any comments with regard to that? It might. I think it would depend on the nature of the claim. And, again, the critical touchstone of the inquiry would be whether what a plaintiff is seeking is, essentially, to second-guess a determination made by the FAA in the certification process. And so, again, to take a concrete example, if you had a claim that someone failed to comply with an airworthiness directive, that would not necessarily, indeed, it would ordinarily not be the subject of an FAA certification decision, and that sort of claim could proceed. And, likewise, with regard to the failure to report a defect after the type certification has issued, again, there would be no second-guessing of an FAA determination. And all we are arguing with regard to the type certification, and I think this was my third point in response to Judge Krause's question, was simply that on this question of whether or not there is field preemption, we think that the weight of authority supports this Court's decision in Abdullah. We cite various cases from other circuits, and, of course, the language from the Supreme Court's decision in City of Burbank, which I think comes close, though not quite on point, to resolving the question of whether there is field preemption. City of Burbank took field preemption very narrowly and addressed noise regulation. It didn't talk about all air regulation. There are differences, differences in the parts, and also differences in the specificity of regulation between the regulations on air operations and airspace management on the one hand, and parts and design on the other. So we're talking about things like appropriate standards or even references to industry standards, which appear in the construction standards, but those don't seem to preempt all state standards. So it is certainly true, Judge Krause, that the Supreme Court did not resolve this issue or else there would have been no need for oral argument in Abdullah. My point is simply that in discussing the Federal Aviation Act in City of Burbank, the court essentially established the premise for our argument today, namely that Congress, in enacting the Federal Aviation Act, was motivated by this desire to establish a uniform and exclusive system of federal regulation. Doesn't that make more sense in the area that's really new, that is where you're dealing with interstate, international airspace management in-flight operations, where you're talking about parts manufacture, how engines are put together, that is something that goes back to the heart of state regulation and state tort standards, doesn't it? Isn't that different in kind than what we were talking about in Abdullah in terms of operations? So I don't think that that is true, and I really do think that it would be illogical to sort of accept what I think is really the acknowledged implication of plaintiff's position, and if you take a look at plaintiff's reply brief, when we cite the U.S. Airways case from the Tenth Circuit, which involved, of all things, beverage distribution on airplanes, I think that there would be a certain illogic to this notion that you would have preemption of claims on that issue, but not preemption of claims with regard to aviation safety, and I think in particular to circle back to your penultimate question on this issue of the specificity of the regulations. It's important to keep in mind that what we're talking about here is field preemption, and so almost by definition when you've got implied field preemption rather than conflict preemption, you're not talking about a situation in which there is necessarily going to be a regulation on point. If there is, there would be an argument potentially for implied conflict preemption as well. What you're really focusing on with regard to field preemption is congressional intent, and the two touchstones that this Court acknowledged in Abdallah are, first, the pervasiveness of the federal regulatory scheme, and again, you're not looking at the specific question in front of you. You're looking at the field as a whole, and second, the strength of the federal interest, and again, if you look at this Court's decision in Ellisad, I think that this Court's reasoning in Ellisad actually does really strongly support our interpretation because to be sure, the Court clarified in Ellisad that the relevant field is the field of in-air aviation safety, but at the same time the Court stated in Ellisad, and I'm quoting from page 128, that most of the regulations adopted pursuant to the Federal Aviation Act, quote, concern aspects of safety that are associated with flight, and then the Court went on to cite the regulations concerning certification in airweightedness and the regulations concerning general aviation. True, but that was not before us, and this issue of design defect wasn't presented there. That wasn't being argued to be sure. Well, the facts didn't involve design safety, and I think ultimately, no, I don't think that it is because I think you have to look to whether or not the Court's reasoning was, in fact, essential to its holding, and I think in both cases. The discussion of airworthiness of aircraft parts and certifications, I mean, that didn't. Well, the holding that we are relying on here is ultimately the holding from ABOA that the field of aviation safety is preempted by Federal law, and again, in Ellisad, all the Court did was to clarify why that field should be limited to in-air safety. I do think that the Court's discussion indicates what the Court actually meant when it was referring to in-air safety, and what it did not mean, in our view, is that that is somehow limited to the in-air operation of commercial aircraft. Again, that's not to say that the Court couldn't have written a narrower opinion. Perhaps it could have, but I think that it is important to focus on the reasoning concerning the contours of the field, and again, I think that the Court's view in this case, consistent with the views of most of the circuits who have addressed the issue, is that the field is quite broad, and to the extent that there are decisions going the other way, obviously the Tenth Circuit's decision in Cleveland and the Eleventh Circuit's decision in the Public Health Trust case, I think that those cases are really not good law in light of the Supreme Court's subsequent pronouncements on the effect of express preemption. And the Ninth Circuit's as well, right, the Ninth Circuit also. I think that the Ninth Circuit's cases are, in broad terms, consistent with this Court's cases. Obviously, the Martin case, which I think was Judge Kaczynski's earlier of the two opinions, essentially reached the same result in the flip-and-fall context as this Court did in Ellis. I think the one difference in the Ninth Circuit's reasoning is that the Ninth Circuit, in my view, attaches probably disproportionate weight to the existence of a regulation that's directly on point, and again, for the reasons that I suggested a couple of minutes ago, I really don't think that that's appropriate when you're making a determination concerning field preemption. The Judge Kaczynski's decision addresses it as a design defect issue, and although the Ninth Circuit otherwise seems to follow a dual law, at least as far as operations, concluded that that did not reach design defect. So we have three circuits, the only three, that have addressed this issue, that have concluded field preemption does not reach design defect, and none that have gone the other way. I think the Ninth Circuit's decision in Green is really a design defect case, so it had this sort of odd aspect to it in that it seemed to treat the design defect claims and the failure to warrant claims distinctly for preemption purposes, and I can't really explain why that was how the Sixth Circuit went about it, but certainly its reasoning on the preemption issue, I think, is directly on point. And again, weaving aside sort of the correct characterization of what was going on in the Ninth Circuit's case, because I acknowledge that it had language about design, as indeed did this Court's decision in Ellisod, I think that the Tenth Circuit has since recognized in U.S. Airways that its reasoning in the earlier Cleveland case is on shaky ground in light of what the Supreme Court has said about the effect of an express preemption clause, and that the existence of an express preemption clause does not preclude the possibility of implied preemption. And I would really point this Court to, among other decisions, the Supreme Court's decision in Geier, which I think clearly addresses that this Court has essentially recognized in its own earlier reasoning in Abdullah that the existence of an express preemption clause is not the spot. Let me change gears slightly about Abdullah. Now, we try to write our opinions to lower courts. It makes it easy for them. They're able to apply our decisions. I mean, I'm sure you've seen in this case and others that district courts were maybe with candor, maybe breathtaking candor, have said this is unworkable. We don't know what to do. What is your comment about that? Is that overblown with what the judges are saying in terms of doing a jury charge? What is your position on that? So I don't think that we are at all concerned with the workability of Abdullah in cases where there is not a certification, because as my friend Mr. Singh rightly points out, there have been cases where district courts have permitted claims to go forward, apply federal standards of care, and it will be possible in cases where there is a federal standard of care on point to instruct juries about those standards. We have no truck with that. I think that the issue that Abdullah certainly left open is the question of the preclusive effect, well known, of a type certification, because that was not at issue in that case. And to get back to one of your earlier questions, Judge Shigaris, it is true. There's not a lot of law on this issue, and you might be sitting there wondering why there isn't a lot of law on this issue, and I think all I can say on that is that it appears not to have really been litigated in all that many cases, and indeed the threshold question of whether or not there's even field preemption has been surprisingly the result of relatively little decisional authority until relatively recently in the grand sweep of things. So, of course, the Federal Aviation Act was enacted in 1958, and this court's decision in Abdullah did not come until 1999, and so even at the time that GARA was enacted, again, there was some uncertainty about the scope of field preemption under the Federal Aviation Act, and we think that it would be a very big negative implication, Judge Krauss, to draw from GARA, that at the same time that Congress, in what was the General Aviation Revitalization Act, preempted state law in one specific respect, that it somehow eliminated or limited implied field preemption without saying so. All right, just one other question. You saw that we asked the FAA for their position. What kind of weight should we give their position? So I don't think, and I say this realizing that the FAA's most recent pronouncement was in our favor on this issue, I don't think the FAA's views on the question of field preemption are entitled to deference. Of course, if the FAA takes the position that it did in Cleveland, that position is in broad terms consistent with Abdullah and our understanding of Abdullah's on the issue of field preemption. I don't think they're entitled to deference. Of course, the expedited agency and their views are entitled to wait, and we'll wait to see what they say. Just one response to Mr. Singh's characterization of what they said in Cleveland. I think that Judge Van Antwerpen rightly pointed out that the reasoning with regard to the existence of remedies and the savings clause did not support plaintiff's position in the way that Mr. Singh suggested. But I would just say that if you go back a couple of pages in the brief to their discussion about the policy reasons why there should be broad field preemption, that all of those policy reasons apply with double force on the question of whether or not an FAA determination such as a type certification should have preclusive effect. Of course, we have no idea what the FAA is going to say in their brief, and we eagerly await their views. My point is simply that I think it would be very hard for the FAA to file a brief, in this case, consistent with its earlier brief in Cleveland that did not support our view on preemption. Of course, the Court has our views on the alternative issue under Pennsylvania law, and unless the Court has any questions, I would rest on our briefs. I do have a few more. Oh, sure. If you're asking us to create a circuit split because those three circuits that have addressed this have concluded field preemption doesn't reach this far, and then we've got our court back in Paleto, in Norell, the Fifth Circuit, the Sixth Circuit, the Seventh Circuit, that all just de facto have been applying state tort law, assuming perhaps it seems so clear to them that that survived. So I don't think that that's true. And, again, I would point the Court to the cases that we cited, pages 34 to 35 of our brief, and how the cases define the relevant field. And to be sure, not all of those cases are design defect cases, Judge Krauss, but I think that the definition of the field in those cases is, in broad terms, equivalent to the definition of the field that this Court has already established in the Abdullah case. Now, again, I think that, in broad terms, the Ninth Circuit has ultimately come out in the same place that we have come out. The Ninth Circuit certainly has not considered a design defect claim of the type at issue here. But, you know, really the adverse authority for us are, first, the earlier Tenth Circuit decision in Cleveland, which I think is by no means clear that the Tenth Circuit would adhere to in light of what it said in its subsequent decision in U.S. Airways, and the Eleventh Circuit's decision in Public Health Trust, which was a relatively short decision that I think rested essentially entirely on the existence of these express preemption clauses. And so, again, in light of the Supreme Court's decisions making clear that express preemption clauses are not dispositive of the implied preemption analysis, I think it's questionable whether or not that decision is, in fact, correct. You mentioned Geier. Let's look at potentially analogous statutory themes, because why don't Geier and Williamson present us with a better way to approach this, and that is comfort preemption. The way a number of the district courts addressing design defect have approached this, saying there's not field preemption. Nonetheless, we're going to take a look, and at the motion to dismiss stage or summary judgment stage, knock out a claim where there are regulations that are clearly on point. So, of course, if you don't have implied field preemption, you can always still have implied conflict preemption. We've litigated the issue in this case as a matter of field preemption, precisely in light of the authority from this court, and, of course, Abdullah, which was on the books when the complaint in this case was initially filed. We think that field preemption is appropriate here, again, for the reasons that this court stated in Abdullah, and I recognize that the facts of Abdullah were somewhat different. But, again, you're dealing with a pervasive regulatory scheme and a very strong federal interest, and not just a strong federal interest in regulation, but a very strong federal interest in the uniformity of regulation. And so, again, we think that the best analogies are to other areas in which courts have found field preemption, and, again, courts have found field preemption under the Ports and Waterways Safety Act and the Locomotive Inspection Act. The automotive context is, you know, I think, somewhat different because the extent of federal regulation is somewhat more limited. But, you know, ultimately, we think that all of the same policy justifications that justify field preemption in those other areas apply with equal force here. And, again, this court has already recognized that in Abdullah, and so what we're really talking about is a question of the scope of the preempted field. And, again, we think that this court has already made that abundantly clear in Abdullah and El-Assad, and, indeed, that it is the holding of those cases that there is preemption with regard to inter-aviation safety. I think this court would really have to revisit that issue and bank in light of the fact that those are holdings of this court. But, again, we think that the reasoning of those decisions stands on its own terms. This is an area in which there is clearly pervasive regulation and not just pervasive conferral of authority on the FAA, but, in fact, the exercise of that authority by the FAA. And the mere fact the standards might seem to be a little less specific nearly reflects the reality that in an area like this where, in fact, you have evolving technology, flexible standards are appropriate and they appropriately confer discretion on manufacturers, and they do not leave room for states to impose higher standards of their own, whether by regulation or whether by the outcomes of juries that simply disagree with the FAA's determination. But particularly with evolving technology so that regulations may not be on point, doesn't there need to be some mechanism for applying a standard of care? Well, there is a mechanism for ongoing FAA supervision. And so, again, if the FAA determines at some point after the fact that a previously approved design is insufficient, and the FAA, of course, exercises that authority, the FAA, as Mr. Singh pointed out, receives service difficulty reports and can take action through the issuance of airworthiness certificates or even through the revocation of a type certification. As this Court may recall, and as I can kind of recall from my childhood, in the wake of a crash of a DC-10 at O'Hare Airport in the late 1970s, the FAA actually revoked the type certification for the DC-10. And so that is something that the FAA retains the authority to do. And so to the extent this Court is concerned that a lot happens after a type certificate is issued in 1966, the FAA has full authority to police that itself, and it, in fact, does so. Notwithstanding plaintiff's efforts to cast aspersions on the FAA's exercise of its supervisory authority, the GAO reports that we cite indicate that, in fact, general aviation has become safer and there have, in fact, been fewer deaths on a consistent year-on-year basis over the last 50 years. And so this suggestion that the FAA has somehow ceded the field, no pun intended, is simply factually incorrect. I've got one final question for you. You've been talking about the type certification standards. Isn't there significance to the fact that when we were looking at the operations in ABOA, when we were looking at Section 121.1E, it talked about rules governing each person who was onboard an aircraft. That does seem in the area the subject is trying to address to be dealing with the standard of care governing all that conduct. In contrast, when we look at something like engine design at 33.1, all it's doing is prescribing airworthy standards for the issuance of a type certificate. It's just the issuance of the certificate itself that's at issue, rather than purporting to address the standard for manufacturing and design. So I think that the standards are, you know, in some sense continuing standards, and I think Plaintiff makes a fair point in, I believe, her reply brief when she states that, you know, pursuing a claim under Section 21.3 of a failure to report a defect, you still have to have a defect, and presumably you would look to those federal standards to determine whether something rises to the level of materiality to constitute a defect. And so while it is certainly true that the predominant use of those standards is to determine whether or not type certification should be granted, again, it isn't as if the FAA at that point just says, all right, anything goes. And so if a defect subsequently comes to light, we're not going to evaluate it. We would presumably look to these same standards to determine whether or not, for instance, a fuel system is designed and constructed to supply an appropriate mixture of fuel throughout the operating range and under all operating conditions. And so it isn't as if that standard somehow evaporates at the point of type certification. Judge, did I interrupt? Do you have anything more? I do not. Thank you, sir. Okay, thank you. Thank you, Counsel. Thank you. Bruce? I'd like to start just where my friend's right hand, which is, you know, he knows that general aviation has been getting a lot safer. I think that can only be a point in our favor because until the district court's decision in this case, liability was broadly available for defects in general aviation designs, and I think that that liability has been one of the forces that's been pushing general aviation in a safer direction. He talks about how the FAA has the authority to revoke type certificates to act, but the evidence in this is repeated in this case and in the case law, the legislative history of GARA, for example, that what the FAA really does is it relies on manufacturers to make their design safe. That's where the regulations allocate the burden, and that is how the system is supposed to work. That's why they have this delegated authority, is because they have a responsibility to keep their designs compliant. But with that delegation comes a real risk that noncompliant designs will get certified in the first instance and then allowed to fly, and the real question for this court is, what happens when one of those designs gets up there and then fails? Are the victims of that accident to be denied a remedy because the design was initially approved on the basis of the manufacturer's data and its representation? So at this point, you have a 21.3 failure to report claim. Is that correct? Well, we certainly have that, Your Honor, but I think it also means that we have the right to argue, we must have the ability to argue, that the design was defective in the first instance, and perhaps that wasn't revealed during the testing that resulted in type certification. But nevertheless, the design itself is defective. It's not a mere failure to report a defect that gives rise to the action. They want to mediate all of these interactions through the FAA. They want us to prove our claim by proving that they had to report the defect to the FAA. The FAA then would have taken corrective action, and then they would have changed the design. That's the sort of causation chain they want us to have to prove. But we think actually the law has been very clear and set up for a long time now that we can prove instead that they designed a defective engine and that that defect caused the crash in this case. And, you know, to talk about how type certification works in practice, you know, my friend on the other side says the FAA approves everything. That's one way of putting it, but the amount of FAA involvement is marginal. So we sent a GAO report that says 90% of certification work is done by designees. The Supreme Court in Varig Airlines explained that the FAA review amounts to a spot check of the thousands of documents that are submitted. I mentioned earlier in this argument that for this engine specifically, you know, which was one of many variants of this engine, the amount of review that would have gone into the D2C and its fuel metering system would have been minimal because similar engine variants had already been certified. This court decided in Robinson v. Hertzler Propeller, commented on the type certification process, and that some manufacturers can grant themselves a type certificate. And effectively, practically, that is what's happening here. The other side's argument is that it's most compelling when you refuse to consider the practical details of how these certification decisions work and of how aviation law has operated for the last 50 years. For the last 50 years, liability remedies have been available when either federal or state rules have been violated. All we're asking is for a continuation of that. What they're asking for, and I think he candidly admitted this when he was up here before you, a lot of airworming-ness claims will go out the window. All design claims will go out the window. The subset of claims that they want to maintain for things that arise later, even a lot of those will go out the window because, indeed, that is this claim. Our claim is that very shortly after the engine was certified and put into operation, it proves to be defective. We want to bring a claim based on that. He wants us to mediate all of that through the FAA's own decision-making apparatus, but there is no reason to. The jury is well capable, as both sides apparently agree, of finding those flaws itself. Unless there are any further questions, I'll let you sit now. Judge Van Anwerpen? I have no further questions. Thank you. Okay, thank you, counsel. We'll take the case under advisement. It was very well argued, and like the case before, we'd like to greet you outside while you bring your whole team. This is Clerk of the Jury Court, and Judge Van Anwerpen will be in touch in a few minutes, okay? Well, thank you, sir. Thank you.